VIVIAN B. HOLMES, Pltff in Error, v. AMELIA D. FIELD, by B. S. PRETTYMAN, her next friend, Deft in Error.

### ERROR TO MASON.

A., the testator, by his will, appointed his wife guardian to his infant daughter, "*so long as she should remain his widow.*" After his decease, his widow took out letters of guardianship for the daughter, from the Probate Court of the proper county.

The widow subsequently married, and a payment on account of the estate of the ward, was then made to her husband. Held:

That the appointment of the Probate Court was void, for want of jurisdiction.

The authority of the father to name a guardian for his children, is greater than that conferred upon the Probate Court; and when the former has exercised the right, the latter cannot act.

That the limitation in the will is strictly legal and must be enforced, and the guardianship of the widow was terminated by her marriage.

That a person makes payments at his peril, and is bound to know whether the payee is authorized to receive his money. The true test as to the validity of the payment, is whether, or not, the payor could successfully resist a suit instituted by the payee.

That the husband of a guardian has no right to possess or control the estate of the ward, and a payment to him on account of such estate is void, unless with the express sanction or direction of the guardian.

That an infant is not always bound to appear in a Court of Chancery by a guardian, although one may be in existence. The bill may be filed by her next friend, and if objection is made in proper time, it rests in the sound discretion of the Court, whether the suit shall so proceed, or in the name of the guardian.

This was a bill in chancery, filed in the Mason Circuit Court by defendant in error, and alleges in substance, that in the year 1835, Drury S. Field, father of complainant, then residing in Fayette County, Tennessee, entered into an agreement with Holmes, the plaintiff in error, to furnish him with $12,500.00, to be expended in entering land in Illinois; Holmes to enter the lands, and bear his own expenses; and after the entering thereof, the lands to be divided—one-fourth to go to Holmes, and the other three-fourths to Field. That Holmes, in pursuance of this agreement, did enter in Field's name ten thousand acres of land. That in 1836, Field loaned Holmes eight hundred and seventy dollars, for which he took notes. That a part of the lands entered were divided between Field and Holmes; but that Field held a part of the lands undivided, as security for the money loaned.

That Field died in April, 1839, leaving as survivors his widow Amelia E. Field and children. That Field made his will, appointing Albert J. Field his executor; by which will he divided his property between his wife and children, giving to his "very and much beloved wife, Amelia E. Field, *during the time she shall*

Holmes v. Field.

*remain my lawful widow,* and during her natural life, the mansion house in which we now dwell, with four hundred acres of land, with all my stock of horses, cattle, farming utensils, &c. And further, that my executor, during the time of her widowhood, should annually pay over to her one hundred and fifty dollars; but should she *marry* and become the *wife of another,* she shall immediately *forfeit* her dower of every description, and have no further claim upon my estate; the land and other things which I *have given* her, to be in that event given to my infant daughter, Amelia D. Field," &c. Makes Albert D. Field guardian of several of his children named in the will, &c.; and then, by the will, it is declared: "And I further appoint my beloved wife, Amelia E. Field, *guardian for my infant* daughter, Amelia D. Field, *so long as she remains my widow.*"

Holmes, by his answer, admits generally the allegations in the bill. Alleges, that Amelia E. Field was duly appointed guardian for her daughter, Amelia D. Field, by the probate court of Sangamon county. That said Court had complete power and authority to make said appointment. That afterwards said Amelia E. Field married Shapley Lester; and that he [Holmes] did in October, 1840, pay to Lester, in the presence of his wife, for her use as guardian of the complainant, the sum of $430.12, which was endorsed on the note, &c. That he paid said money in good faith, while the letters of guardianship were in full force, &c. That Mrs. Lester had possession of the note at the time of payment as guardian, and threatened to sue. That the ward was living from home at the time, and needed the money; and the payment was urged for this reason. Denies any knowledge that Mrs. Lester had no authority, &c., and of the contents of the will.

The other defendants disclaim, &c. There was no replication to the answer, nor any proof taken.

At May term, 1851, Minshall, Judge, entered a decree against Holmes, refusing to allow him the $430.12 paid to Mrs. Lester.

By consent, the writ of error was returned to the Court held in the Third Division. The question raised was the validity of the payment by Holmes to Lester.

R. S. BLACKWELL, for Pltff in Error.

The payment made by Holmes to Lester and wife, on the 9th October, 1840, was valid, and operates *pro tanto* to discharge his indebtedness to the complainant. 1. Because Mrs. Lester was the guardian of the complainant, under and by virtue of the will of her former husband, notwithstanding the condition in the will, that her guardianship should cease upon marriage. This condition being in restraint of marriage, and there being no disposition over of.the custody of the ward, is to be regarded as *in terrorem* merely. 1 Story's Eq., sec. 287; Parsons v. Winslow, 6 Mass. Rep., 170; Marples v. Brain, 1 & 2 Madd. Ch. R., 317. 2. Because she was guardian by appointment of the probate court; and as long as those letters of guardianship remain in full force, a payment to her on account of her ward, is valid. Allen v. Dundas, 3 T. R., 125; Moore v. Tanner, 5 Munroe, R. 45. 3. Because she was guardian *de facto;* at all events, had possession of the note, and a *colorable* right to receive the money. A payment under such circumstances, must be regarded as valid. 2 Kinne's Comp., 463; Poth. Obl., 299; R. S., 266, sec. 7; 268, sec. 20; Baldwin v. Kellogg, 1 Day, 4; Kelley v. Cowing, 4 Hill, 266. This payment must be sustained, upon principles of natural equity, upon the ground that Holmes paid the money to Mrs. Lester in good faith, without any knowledge of the circumstances by which her authority was put an end to. Morton v. Fox, 4 Bibb, 392.

MERRIMANS & JOHNSON, for Deft in Error.

CATON, J.    The only important question presented in this case is, as to the validity of the payment by Holmes, of four hundred and thirty dollars and twelve cents, made on the ninth of October, 1840, to Shapley Lester, in the presence of his wife, former guardian of the complainant. This payment was disallowed by the Circuit Court; and after the most mature examination and reflection, we are satisfied with that decision. By his last will and testament, Drury S. Field appointed Amelia E., his wife, guardian to his infant daughter, the complainant, *so long as she should remain his widow.* She subsequently married Lester, still retaining possession of the note against Holmes, which belonged to the estate of the complainant. After the death of Field, and before her marriage to Lester, she took out letters of

guardianship for the complainant, from the Probate Court of the proper county.

No additional authority was conferred upon the mother of the complainant, by the appointment by the Probate Court. She was already, by the will of the testator, appointed guardian to the complainant; and that appointment was as perfect, as complete, and as absolute, during the time prescribed by the will, as it could be made; and the appointment by the Probate Court, as if by way of compliment to the will, was an act of supererogation, and entirely nugatory. The action of that Court conferred no more authority upon the testamentary guardian, than it would upon a stranger, in derogation of the rights of the guardian appointed by the will; and the appointment of a stranger, no one will doubt, would have been utterly void. The Court acted upon a case over which it had no jurisdiction. Robinson *v.* Zollinger, 9 Watts, 169. It is this want of jurisdiction that makes the act utterly nugatory. It is only by virtue of the statute that the Probate Court could appoint a guardian in any case; and, of course, it is only in the particular cases authorized by the statute, that the Court has any jurisdiction to act. By our statute, which confers upon the parent broader powers than that of 12 Charles 2d, the father is authorized, by deed or will, to appoint a guardian to his children till they shall arrive of age, or for any less term: "*Provided,* That the rights, powers, duties, and obligations of such person or persons, may be restrained and regulated by the person making such deed or last will as aforesaid." Here, the father is vested with authority to dispense with provisions of the statute, which must in all cases apply to and govern guardians appointed by the Probate Court; so that the authority conferred upon the father, is greater than that conferred upon the Court; and when the right has been exercised by the former, there is no room left for the Court to act. The Probate Court might as well have appointed a guardian for an adult. The ward was already furnished with a guardian appointed by a superior power, the father of the infant, who was properly amenable to the Circuit Court under the twentieth section of our act, or to the Court of Chancery under its general and well-known jurisdiction. Had the appointment been made by a Court having jurisdiction to act in the premises, although it might have acted erroneously, still its order would

have been valid and binding, until reversed or set aside, and a very different case would have been presented. The appointment being good till reversed, the authority of the guardian to act could not be questioned collaterally. But here there was no jurisdiction, and the appointment was void. I shall, therefore, lay out of view entirely the appointment by the Probate Court, and consider the authority of the guardian as derived solely under the will.

That authority, by the terms of the will itself, terminated upon the subsequent marriage of the guardian with Lester. But that clause of limitation, it was insisted, was *in terrorem,* and void as being in restraint of marriage; and in support of this, a class of cases is referred to, where a similar clause had been so held, when attached to a devise of property, and where no devise over is made. But the cases are not alike. The appointment of a guardian bears no resemblance to a devise of property. The former is the conferring of a power, and the delegation of a personal trust; and that, too, without any interest in, or benefit to the person appointed: the latter is the grant of an estate or interest, solely for the benefit of the devisee. The motives or considerations which would conduce to the selection of the one, might have no influence in the choice of the other. The object in the selection of a guardian, is to promote the well being, and for the sole benefit of the ward; and qualifications which will best promote these ends, are sought after in the guardian, it may be, irrespective of obligation or affection: while these last almost entirely control, in the case of a devise. Nothing may have been more judicious, so far as the ward's interests were concerned, than this limitation in the appointment of the guardian. While the mother, during her widowhood, may have been the most fit person to have the control of the infant, and the management of her estate, it would by no means follow, that they would be equally safe in her hands, after she should become subject to the influence and control of a second husband, a stepfather to the child. This must be so perfectly apparent to every one, that it is unnecessary to enlarge upon the subject. We can see sufficient reasons, from a regard for the interests of the child alone, to justify this limitation, without attributing it to any other motive. We therefore consider this limitation, not only perfectly legal, but entirely proper; and the will of the testator,

in that respect, must be faithfully observed, and strictly enforced.

At the time this payment was made to Lester, the authority of his wife to receive the money, as guardian to the complainant, had ceased; as completely so, as if she had been removed by a Court of competent jurisdiction, or as if the ward had arrived at her majority. She had no more authority to receive the money, than as if she had never been appointed guardian. Holmes alleges in his answer, that he paid the money in good faith, and that he did not know of the provisions of the will, so far as it relates to the said guardianship. As no replication was filed to the answer, its statements must be taken to be true in fact. But his ignorance that she had ceased to be guardian, cannot help him. He made the payment at his peril, and was bound to know whether the person to whom the payment was made, was authorized to receive the money or not. The question is, whether he, or the infant, shall suffer the consequences of his negligence. He says he made the payment under the threat of a prosecution. Had such prosecution been instituted, he could have resisted it successfully. And this is indeed the true test, by which to determine whether he shall be protected in making the payment, as will be seen by a reference to the authorities cited by his counsel on the argument. In the case of Allen *v.* Dundas, 3 T. R., 125, administration had been obtained from the ecclesiastical court, upon a forged will, and letters testamentary issued to the executor named; and it was held, that a payment made to him in that capacity, before the letters were revoked, would protect the debtor; and the decision is placed expressly on the ground, that he could not have successfully defended a suit brought against him by the executor. The supposed testator was actually dead, and the ecclesiastical court had jurisdiction, to take proof of the will, and grant administration upon his estate; and having had jurisdiction, its order was valid until revoked by a proceeding instituted for that purpose, and could not be questioned collaterally. Had the man still been living, the ecclesiastical court would have had no jurisdiction, and its order would have conferred no authority to collect or receive the money, and the payment would not have discharged the debtor, although made in the utmost good faith, and under the sanction of a court having apparent authority to act. Ash-

hurst, J., commences his opinion in that case, thus: "I am of opinion, that the plaintiff has no right to call on the defendant to pay this money a second time, which was paid to a person who had at that time a legal authority to receive it. It is admitted, that if he had made this payment under the coercion of a suit in a court of law, he would have been protected against any other demand for it; but I think that makes no difference. For, as the party to whom the payment was made had such authority as could not be questioned at the time, and such as a court of law would have been bound to enforce, the defendant was not obliged to wait for a suit, when he knew no defense could be made to it. This, therefore, cannot be called a voluntary payment." This case, we see, is expressly put upon the ground, that the debtor could not have resisted the payment which he had made; and it would have been very hard indeed, if the Court would not have protected the party in making a payment without coercion, which they would have compelled him to make. The case of Moore *v.* Towers' adm'r, 5 Monroe, 45, is, in all its principles, and nearly all its features, precisely like the former; and was decided in the same way, and for the same reasons, although no reference is made to it.

Suppose in this case, the ward had arrived at her majority, before this payment was made, would Holmes have been protected in a payment to the late guardian, because the debtor was ignorant of that fact? And yet she would have had the same authority to receive the money in that case, that she had in this. In that case, his ignorance would have been much more excusable than in this, for here he had the means of ascertaining precisely the nature and extent of the guardian's authority, for the will had been upon the public records ever since 1838, and in the same office where he found the void appointment of her as guardian, by the probate court, which probably misled him. The question is one of legal authority on the part of the supposed guardian, to receive the money, and not of good faith on the part of the debtor. If the authority of the guardian has ceased, either by limitation or removal, ignorance of that fact cannot protect the debtor. If he could have successfully resisted the payment as against the guardian, then the ward may successfully resist it as against him.

I have hitherto examined this case, as if the payment had been

made to Mrs. Lester. That, however, the defendant admits in his answer, was not the case. He states that he paid the money to Mr. Lester, in the presence of Mrs. Lester, and he does not pretend that she in any way sanctioned the payment, even by her silence, or that the money ever came to her hands, or was under her control, or was ever applied to the benefit of the ward. The only thing in the answer, from which we might infer that the payment was made with her approbation, is that she had threatened to sue him, if he did not pay the whole or a part of the note. Surely Holmes cannot insist that he was ignorant of the fact that Lester was not guardian, and had no right to receive the money. Even if the authority of the guardian had still continued, the payment to Lester, without her express sanction or direction, would have been void. As the husband of the guardian, he would have no right to possess or control the estate of the ward.

In every point of view, we are satisfied that this payment was not valid as against the ward.

Another objection was taken upon the argument, which should be noticed. Previous to the filing of this bill, another guardian had been appointed by the probate court, and this bill was filed, not by that guardian, but by the next friend of the complainant, and to this the objection is raised. An infant is not always bound to appear in a court of chancery by a guardian, although one may be in existence. She may file her bill by her next friend, and if an objection is taken in proper time, that there is a guardian by whom the bill should have been filed, it may be that the Court, in the exercise of a sound discretion, may determine whether the suit shall proceed as it was commenced, or in the name of the guardian. The fourth section of our Chancery Act says, "Suits in chancery may be commenced and prosecuted by infants, either by guardian or next friend." It is frequently necessary for the infant to file a bill against the guardian; and when that is not the case, there may be reasons for fearing that the guardian is not acting judiciously, or in good faith, in relation to the subject of the suit. It is the business of the court of chancery, to see that no one stands between the infant, and a just protection of her rights, and for this purpose, the Court may appoint a person to prosecute or defend for the

infant. So far as appears, this objection is now raised for the first time. It is now too late even to be inquired into.

The decree of the Circuit Court must be affirmed, with costs.

*Decree affirmed.*