McClelland v. Bartlett et al.

---

## John M. McClelland

### v.

## Ichabod S. Bartlett et al.

PROMISSORY NOTE—PAYMENT —If a party would be secure in paying negotiable paper to a payee or assignee, before or after maturity, he must see to it that he pays to a holder of the note, and not to one who has been, but is not when payment is made. He should ask to see the notes before he pays them, and should take them up when paid.

APPEAL from the Circuit Court of Kane county; the Hon. T. D. Murphy, Judge, presiding. Opinion filed May 2, 1879.

Messrs. Botsford & Barry, for appellants; that Kribs was the general agent of Bartlett, and hence had general powers,

cited 2 Kent's Com. 620; Doan v. Duncan, 17 Ill. 274; U. S. Life Ins. Co. v. Advance Co. 80 Ill. 549; McGregor v. McDevitt, 64 Ill. 261.

The mortgage was on the public records, and notice to all. Morrison v. Brown, 83 Ill. 562.

Complainant was guilty of no laches: Stevenson v. O'Neal, 71 Ill. 314; Shreeves v. Allen, 79 Ill. 553; Comstock v. Hannah, 76 Ill. 530.

As to ratification of the acts of Kribs: Roby v. Cossitt, 78 Ill. 638; Searing v. Butler, 69 Ill. 575.

Complainant is not responsible for a misapplication of the money paid: Mason v. Bauman, 62 Ill. 76.

Mr. J. W. RANSTEAD, for appellees; that Kribs was not the general agent of Bartlett, and it was the duty of complainant to ascertain the extent of his authority, cited Story on Agency, § 126; Williams v. Merritt, 23 Ill. 623; Smith v. Peoria Co. 59 Ill. 416; Baxter v. Lamont, 60 Ill. 237.

The sale of the notes to complainant was in fraud of the rights of appellees, and they cannot be held responsible therefor: Johnson v. Barber, 5 Gilm. 425; Tuller v. Voght, 13 Ill. 277; Oxford v. Peters, 28 Ill. 434.

Complainant should have ascertained if there was any equitable reason why the mortgage should not be enforced, and failing to do so, must abide the consequences: Olds v. Cummings, 31 Ill. 189; Haskell v. Brown, 65 Ill. 29; Bryant v. Vix, 83 Ill. 11.

If the decree be erroneous only in part, it should be reversed only as to that which is erroneous: Rev. Stat. 1874, Chap. 110, § 82; Laws of 1877, 71, § 10; Enos v. Capps, 12 Ill. 255; De Wolf v. Haydn, 24 Ill. 529; Rees v. City of Chicago, 38 Ill. 322.

Subsequent purchasers in good faith of the lots, without notice of any equities between complainant and Bartlett, ought not to be prejudiced: Prevo v. Walters, 4 Scam. 35.

LELAND, J. This was a bill to foreclose a mortgage filed by John M. McClelland, who claimed to be the holder by assign-

ment of two promissory notes for $800 each, secured by mort-
gage given by Ichabod S. Bartlett to Edward S. Wilcox, assigned
by him to his brother, John S. Wilcox, and delivered to McClel-
land by the latter through one John G. Kribs, in whose pos-
session they were placed under circumstances mentioned here-
after; and there was a cross-bill by Bartlett to declare the
notes paid and the mortgage satisfied.    McClelland purchased
the notes of John S. Wilcox through Kribs and paid him there-
for    $1,600, which was immediately paid by Kribs to John S.
Wilcox.    At the time they were thus sold and delivered to
McClelland, which was Oct. 9th, 1873, there was on each note
a blank assignment as follows: "Ed. S. Wilcox," over which
name John S. Wilcox had, prior to placing them in the hands
of Kribs, written the words "without recourse."    On the 21st
of October, 1870, Edward S. Wilcox and wife conveyed a tract
of land in the city of Elgin to Bartlett & Bartlett, on    the
same day, among others, gave Wilcox a note for $800, payable
in two years from date, and one for a like amount payable in
three years from date, with a mortgage on the purchased land
to secure the notes.

October 21st, 1871, Edward S. Wilcox sold the notes with
the mortgage security to his brother, John S. Wilcox, and made
the above assignment in blank on the notes.    As is sometimes
done, as a matter of convenience in discharging a mortgage on
record without recording a written assignment and having the
discharge made by the assignee, Edward S. Wilcox gave his
brother a blank release, probably undated, to be used when the
notes should be fully paid up.

In November, 1871, Bartlett then being the owner, subdivi-
ded the tract of land into forty city lots, and after the record-
ing the mortgage, conveyed all the lots to different purchasers,
who are made defendants.

There would seem to be some inaccuracies in the allegations
in the bill, as to these conveyances, or in the record as to the
evidence.    At any rate, the allegations and proof do not agree.
Lot 36 is alleged to be in a deed from Bartlett to Sheffer, but
it is not in the abstract of the deed.    Lots 10, 12, 14 and 16
appear by the evidence to have been conveyed by Bartlett to

Kribs, but there is no allegation in the bill that they were. Lots 18 and 20 appear by the evidence to have been conveyed to B. P. Mason, but there is no allegation that they were. It is alleged that Bartlett conveyed them to Kribs, and this is proved; Bartlett, according to the evidence, having conveyed them to Mason, and also afterwards to Kribs, the deed to Kribs being, however, first recorded.

The allegation in one place in the bill as to the releases of Edward S. Wilcox having been recorded prior to October 9th, 1873, does not seem to be accurate, and conflicts with an allegation on the subject in another part of the bill. Lot 16 is probably accidentally omitted from those mentioned in the bill as released. These and other inaccuracies should be corrected by amendment of the bill before another hearing.

While Bartlett was still the owner of many of the lots, an arrangement was made between him and James Coleman and John G. Kribs which it is difficult to understand fully. The three were each in some way interested in the division of the proceeds to be derived from the sales of the lots, either as owners, or in being paid for services rendered in effecting sales. The only evidence as to what the relations of Bartlett, Coleman and Kribs were, is that of the two former; and they have evidently omitted to state the whole facts fully. The latter was not examined as a witness. Bartlett, who had given some kind of a contract to Coleman, says he had an interest in the property of $800, besides paying incumbrance, which Coleman agreed to do, and that he got this $800 out of the proceeds—part in money and part in notes. Coleman was evidently pecuniarily embarrassed, and it was not convenient for him to have the title in his name; consequently when sales were made, Bartlett made deeds. Bartlett also, on Oct. 10th, and November 1st, 1873, conveyed to Kribs a portion of the lots, and Kribs afterwards executed deeds to various parties.

If Bartlett's statement be true, that his interest was only as above stated, then Coleman and Kribs were to divide proceeds of sales over Bartlett's $800 in equal or unequal proportions, or Coleman was to have all the proceeds, and Kribs was to be paid for his services as confidential title holder and lot seller for Coleman.

Coleman says that he was to pay the Wilcox notes and interest, and Kribs $50, which Kribs charged Bartlett, and that he had the balance of the lots conveyed to Kribs, to be held for him. How matters stood between Coleman and Kribs does not appear; consequently if Coleman and Kribs—if they were jointly interested in the lots, or Kribs alone if not—could manage not to pay the Wilcox notes, they, or one of them, would be that much better off. In this condition of things, and while Bartlett still held the legal title in his name, and Coleman held a contract of some kind from Bartlett, an auction or public sale of the lots was advertised, and the unsold lots, except perhaps those afterwards deeded by Bartlett to Kribs to hold for Coleman, were sold at auction on the terms one-third cash, balance in one and two years with mortgage; and Bartlett made deeds to the several purchasers, and these deeds bear date Oct. 10th, 1873; but the payment of the paid portions of purchase money and the giving the mortgage afterwards for the unpaid part, were probably, and according to Bartlett's answer, about the 20th of that month. When sales were made, lots were from time to time inserted in the blank release; and in one instance Edward S. Wilcox furnished another release containing some lots which Kribs passed over to a purchaser. It would also seem to have been the understanding of J. S. Wilcox, the then holder of the two $800 notes, and perhaps of Bartlett, Coleman and Kribs—though it is not certain that the last three ever intended to do so—that Kribs should pay the two $800 notes out of the proceeds of the sales of the lots. J. S. Wilcox, who seems not to have had confidence in Coleman, after writing "without recourse" as stated, placed the two $800 notes in Kribs' hands, and Kribs was ostensibly constituted by Bartlett and Coleman, or perhaps more particularly by the latter, an agent to collect the proceeds of the sales and apply part thereof to the payment of the two $800 notes thus left with him by Wilcox, who also left with him the before mentioned, probably undated release signed by Edward S. Wilcox. Coleman does not swear, however, that Kribs in his accounts with him deducted out of proceeds of sales of lots any amount as paid to Wilcox on the two $800 notes. Of course, if Bartlett received the

$800 belonging to him out of the proceeds of sale as before stated, there was no deducting as to him of money paid by Kribs to Wilcox, and he may possibly not have known how it was, or he may have known all about it. All that was done and known by the three is probably not disclosed.

The complainant and Kribs had been acquaintances. They used to be neighbors when Kribs was a boy, and Kribs had discovered that the old gentleman had lately sold his farm, and that he was in funds. It was a good financial operation for him and Coleman to get along without applying the proceeds of the sales of the lots to the payment of the two $800 notes. Consequently Kribs, having in his possession the $800 notes, which Coleman ought to pay, and which he says it was his duty to pay, instead of applying the proceeds of the sales for that purpose, on the 9th day of October, A. D. 1873, sold the notes to complainant for $1,600, the interest having been paid, and passed them over to him already indorsed in blank and "without recourse," as aforesaid, and actually paid John S. Wilcox the $1,600 thus received in the very checks he obtained. Wilcox perhaps did not know, and probably did not care, whether he occupied the position of a seller of the notes without recourse, or that of one whose notes had been paid. To us, however, it appears very clear that McClelland, on the 9th day of October, A. D. 1873, became the purchaser of the two notes and of the mortgage as incident thereto, and that no money paid to Kribs by Coleman, after J. S. Wilcox had ceased to be the holder of the notes, was a good payment as against one to whom they had been transferred, and who was the holder for value. If a man desire to be safe in paying negotiable paper to a payee or assignee, before or after maturity, he must see to it that he pays to a holder of the note, and not to one who has been, but is not when he pays. Holmes v. Field, 12 Ill. 424; Story on Promissory Notes, § 375. If Kribs had the notes with authority to sell them, and we think he had, payment to him after he had sold them will not satisfy them, though the one paying supposed he still held them. He should have asked to see the notes before he paid them, and should have taken them up when paid. All the payments made by Coleman to

Kribs, if made by retaining proceeds of sales by the latter, were after Wilcox had ceased to be the owner and holder of the notes, and after, through Kribs, he had sold and delivered them to complainant for a valuable consideration regularly indorsed. It does not, however, even appear that Kribs did retain the $1,600 from Coleman's money in his hands. On the contrary, it looks very much as though the amount retained, if any, was not for the sole pecuniary advantage of Kribs; that he did not really embezzle the $1,600, but that Coleman, who had contracted with Bartlett that he would do so, has omitted, or that Coleman and Kribs, if jointly interested, have omitted to use the proceeds of sales for that purpose, and that in a mere pecuniary view of the subject, it is a matter of no moment to them whether complainant or Bartlett's grantees should bear the loss.

The complainant certainly has more of the appearance of a victim than any one else in this record. We can look upon him in no other light than as the assignee and holder of the unpaid two $800 notes and the mortgage, and that he is entitled to foreclose the same and make the amount thereof out of the mortgaged premises, or some portion thereof, and that therefore, by the decree dismissing his bill, and by granting the relief prayed for in Bartlett's cross-bill, thus destroying his mortgage and also declaring his two notes paid, so that he has no redress either in equity to foreclose and sell, or at common law by suit against maker or prior endorsers, there was error.

It is apparent that the bias and leaning of Bartlett, Coleman & Kribs, perhaps because not financially prosperous, were very strong in favor of owing debts rather than of paying them, and that for this reason among others, it seems to us that the mortgage debt was never paid to John S. Wilcox, or to Kribs for him, out of the proceeds of the sales of the lots, but solely to Wilcox out of the proceeds of the sale of the two notes. Even, however, if Coleman did pay the notes to Kribs for Wilcox, they were paid to one who had no right to receive payment after the notes were transferred for value, and while McClelland, the complainant, was the legal owner and holder. If it were true that Kribs, after paying the $1,600 received of complainant

to Wilcox, had embezzled $1,600 of Coleman's money in his hands, or of money belonging to Bartlett and Coleman, or Coleman and Bartlett's share, if the money belonged to all three, Bartlett and Coleman or one of them certainly would have said so distinctly on his examination as a witness.

For the reasons stated we think the decree should be reversed and the cause remanded, and that the questions as to which of the lots should be first liable should be left in less confusion and uncertainty, by more accuracy of allegation and proofs, and that to that end complainant have leave to amend his bill. We think the lots to which the title still remains in Kribs, if any, should be first sold and the proceeds applied, and next, the other lots unreleased at the time complainant purchased the notes, should be applied to the satisfaction of the mortgage debt.

Reversed and remanded.